UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| EMA FINANCIAL, LLC, a Delaware Limited Liability Company, | Case No.: |
| Plaintiff, | **COMPLAINT** |
| - against - | |
| WOD RETAIL SOLUTIONS, INC. f/k/a ELITE DATA SERVICES, INC., a Florida Corporation, | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff, EMA Financial, LLC ("EMA" or "plaintiff"), by its undersigned attorneys, for its complaint, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for specific performance, a permanent injunction, breach of contract, and related relief arising as the result of defendants' conduct in connection with certain agreements to purchase securities, a related convertible note agreement, and a settlement agreement. After entering into negotiated, arms-length agreements, for which defendant WOD Retail Services, Inc. ("WODI or "defendant") received valuable consideration, WODI breached the agreements, in numerous ways, including, *inter alia*, by: (i) failing to honor EMA's notices of conversion, (ii) failing to establish, maintain and increase a share reserve, (iii) failing to timely submit their required SEC filings, (iv) and by admitting in public filings that it is insolvent and unable to pay its debts as they come due. Accordingly, plaintiff seeks the relief set forth herein.

## PARTIES

2. Plaintiff EMA Financial, LLC ("EMA" or "plaintiff") is a limited liability company duly organized under the laws of the State of Delaware and having a place of business located at 40 Wall Street, New York, New York.

3. The members of EMA reside in New York and Delaware.

4. For purposes of diversity, EMA is a citizen of New York and Delaware.

5. Upon information and belief, Defendant WOD Retail Solutions, Inc. f/k/a Elite Data Services, Inc. ("WODI") is a corporation organized and existing under the laws of the State of Florida having its principal place of business located at 4447 N Central Expressway, Suite 110-135, Dallas, Texas.

6. For purposes of diversity, WODI is a citizen of Florida and Texas.

7. WODI is a publicly traded company, trading under the symbol "WODI."

8. No member of EMA is a citizen of Florida or Texas.

9. There is therefore complete diversity of citizenship.

## JURISDICTION AND VENUE

10. The Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2) in that the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11. This Court has supplemental jurisdiction of Plaintiff's various state law claims pursuant to 28 U.S.C. Section 1367(a).

12. Venue is proper in this District pursuant to 27 U.S.C. §1391(a), in that it is a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, or a substantial part of the property which is subject to this action is situated.

13. Additionally, in the relevant agreements, defendant consented to jurisdiction and venue in the Southern District of New York.

## FACT COMMON TO ALL CLAIMS FOR RELIEF

14. On or about July 14, 2015, after arm's-length negotiations, WODI executed a Securities Purchase Agreement (the "SPA") and issued a Convertible Note to EMA (the "Note") in the amount of $156,500. A true and correct copy of the Note is attached hereto as Exhibit A. A true and correct copy of the SPA is annexed as Exhibit B.

15. The Note provides that EMA, at any time after the Issue Date of the Note, has the right to convert all or part of the Note into shares of WODI common stock (the "Common Stock"). Specifically, §1.1 of the Note provides in pertinent part:

> The Holder shall have the right, in its sole and absolute discretion, at any time and from time to time to convert all or any part of the outstanding amount due under this Note into fully paid and non-assessable shares of Common Stock.

Ex. A at 1.1.

16. Likewise, 1.4(a) of the Note provides that: "Subject to Section 1.1, this Note may be converted by the Holder in whole or in part at any time and from time to time after the Issue Date, by submitting to the Borrower a Notice of Conversion…"

17. As §1.2(a) of the Note dictates: "The conversion price hereunder (the "Conversion Price") shall equal the lower of: (i) the closing sale price of the Common Stock on the Principal Market on the Trading Day immediately preceding the Closing Date, and ((ii) 60% of the lowest sale price for the Common Stock on the Principal Market during the twenty (20) consecutive Trading Days immediately preceding the Conversion Date, provided, however, if the Company's share price at any time loses the bid (ex: 0.0001 on the ask with zero market makers on the bid on level 2), then the Conversion Price may, in the Holder's sole and absolute discretion, be reduced

to a fixed conversion price of 0.00001 (if lower than the conversion price otherwise), and provided, further, that the Conversion Price shall be subject to Section 1.2(b) below."

18. Further, under §1.4(d) of the Note: "Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (the "Deadline")."

19. In order to ensure that sufficient shares are available for conversion, §1.3 of the Note provides that:

> The Borrower covenants that the Borrower will at all times while this Note is outstanding reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note. The Borrower is required at all times to have authorized and reserved three (3) times the number of shares that is actually issuable upon full conversion of this Note (based on the Conversion Price of the Notes in effect from time to time)(the "Reserved Amount"). Initially, the Company will instruct the Transfer Agent to reserve eight million (8,000,000) shares of common stock in the name of the Holder for issuance upon conversion hereof. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable.

20. In order to ensure that EMA at all times has shares reserved in connection with the outstanding Note §5 of the SPA states that:

> In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement and the Securities (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount (as defined in the Note) signed by the successor transfer agent to Company and the Company… The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5, and stop transfer instructions to give effect to Section 2(f) hereof (in the case of the Conversion Shares, prior to registration of the Conversion Shares under the 1933 Act or the date on which the

4

Conversion Shares may be sold pursuant to Rule 144 without any restriction as to the number of Securities as of a particular date that can then be immediately sold), will be given by the Company to its transfer agent and that the Securities shall otherwise be freely transferable on the books and records of the Company as and to the extent provided in this Agreement and the Note; (ii) it will not direct its transfer agent not to transfer or delay, impair , and/or hinder its transfer agent in transferring (or issuing)(electronically or in certificated form) any certificate for Conversion Shares to be issued to the Purchaser upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; and (iii) it will not fail to remove (or direct its transfer agent not to remove or impair, delay, and/or hinder its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Purchaser upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement

21. The SPA requires that the Company must maintain its listing on the OTC Markets and remain current in its reporting obligations. Under §4(e) of the SPA the Company must: "comply in all respects with the Company's reporting, filing and other obligations."

22. Page 1 of the Note provides that the Company must repay the unpaid interest and principal balance of the Note by July 14, 2016.

## **WODI BREACHES THE AGREEMENTS**

23. On August 3, 2018 WODI failed to file a Form 8-K in connection in accordance with Section 4(h) of the SPA.

24. On February 5, 2016, in accordance with Section 1.3 of the Note, EMA requested that WODI increase the number of shares in the reserve.

25. In violation of the various agreements WODI failed to increase the reserve of shares.

26. As a result, EMA sent WODI a default notice.

27. On or about July 14, 2016, the Note matured, but WODI failed to pay or otherwise satisfy the terms of the Note.

## THE SETTLEMENT AGREEMENTS

28. On or about October 31, 2019, in order to settle their disputes, the parties entered into an amendment to the Note (the "First Settlement Agreement").

29. The First Settlement Agreement provides, *inter alia,* that the parties agree that the default balance due under the Note will be limited to the sum of $375,000.00. The First Settlement Agreement also provided for a "bleed out" in connection with the sale of the shares and for an adjustment in the conversion price.

30. The First Settlement Agreement also provided that defendant pay the agreed upon default balance amount of $375,000.00 on or before December 11, 2019 or the First Settlement Agreement would be deemed null and void.

31. Defendant made no payments under the First Settlement Agreement and did not pay the default balance of $375,000 by December 11, 2019.

32. As the result of defendant's breach of the First Settlement Agreement, the parties subsequently entered into an additional amendment on or about February 3, 2020 (the "Second Settlement Agreement.")

33. The Second Settlement Agreement provided that the parties agreed to limit the default balance due under the Note to the sum of $380,000.00 with $50,000 to be paid on or before February 10, 2020, $50,000 to be paid on or before February 17, 2020, $50,000.00 to be paid on or before February 28, 2020, $50,000.00 to be paid on or before March 13, 2020 and $180,000.00 to be paid on or before March 31, 2020.

34. The Second Settlement Agreement further provides that plaintiff agreed not to effectuate any conversions provided that payment was timely made and that the Second Settlement Agreement would be null in the event that the default balance of $380,000.00 was not timely paid but that all other portions of the Note remained in full force and effect.

35. Defendant made a single payment of $50,000.00 under the Second Settlement Agreement but made no other payments.

36. As a result of defendant's breach of the Second Settlement Agreement, EMA was entitled to convert the Note into shares of stock.

37. Accordingly, on or about February 21, 2020, plaintiff sent a notice of conversion to the transfer agent, seeking to convert the sum of $4,110.00 into 1,000,000 shares of defendant's stock at a conversion price of $0.00486.

38. Defendant breached the various agreements by instructing its attorney to send a letter to the transfer agent objecting to the conversion.

39. Accordingly, EMA is entitled to enforce each of its rights under the Note and SPA.

40. Section 3.2 of the Note provides for a breach in the event that:

The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so at any time following the execution hereof or) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement,

7

statement or threat that it does not intend to honor the obligations described in this paragraph)… It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent…

41. Likewise, Section 5 of the SPA provides that

Upon receipt of a duly executed Notice of Conversion, the Company shall issue irrevocable instructions to its transfer agent to issue certificates, registered in the name of the Purchaser or its nominee, for the Conversion Shares in such amounts as specified from time to time by the Purchaser to the Company upon conversion of the Note, or any part thereof, in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions"). In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement and the Securities (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount (as defined in the Note)) signed by the successor transfer agent to Company and the Company.

42. Further the Section 3.15 of the Note provides that it shall be considered an Event of Default if: "The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed."

43. Each of these lawsuits, judgments, and the receivership triggered an event of default under the terms of the Note. Additionally, in the Form 10-Q, filed with the SEC for the quarterly period ending June 30, 2016, WODI admitted that it is likely insolvent and noted as follows:

The Company incurred losses of $3,538,456 and $5,319,659 during the six months ended June 30, 2016 and 2015 respectively. Cash used in operating activities was $2,455,791 and $1,855,745 for the six months ended June 30, 2016 and 2015 respectively. The Company is seeking additional sources of equity or debt financing, and there is no assurance these activities will be successful. These factors raise substantial doubt about the Company's ability to continue as a going concern

and the Company's continued existence is dependent upon adequate additional financing being raised …

44. Accordingly, based upon its insolvency, WODI is in breach of Section 3.7 of the Note which provides for a breach in the event of "Bankruptcy, insolvency, reorganization…" Likewise, WODI breached Section 3(x) of the SPA that provides that: "the Company (after giving effect to the transactions contemplated by this Agreement) is solvent…currently the Company has no information that would lead it to reasonably conclude that the Company, could not, after giving effect to the transaction contemplated by this Agreement, have the ability to, nor does it intend to take any action that would impair its ability to, pay its debts from time to time incurred in connection therewith as such debts mature."

45. WODI also failed to pay the Note upon maturity.

46. Section 3.3 and 3.4 of the Note further provide for an event of default for each breach of a covenant, representation, or warranty made by WODI in connection with the Agreements.

47. Based on the foregoing events, WODI's failure to honor EMA's Notices of Conversion and other actions and omissions has given rise to one or more "Event of Default" pursuant to the terms the Note. In addition thereto, WODI's conduct has caused multiple "Events of Default" to occur.

48. Section 8 of the Note outlines the negotiated-for and agreed-upon remedies for the differing Events of Default. Among other things, EMA is permitted to enforce any and all of plaintiff's rights under the Note and SPA, or otherwise as permitted by law.

49. Page 1 of the Note provides that: "Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid ("Default Interest")."

50. Due to WODI's persistent and willful failure to remedy its various breaches, as of filing the instant action, default interest has been accruing at a rate of 24%.

51. Section 3.16 of the Note provides that, in the event of default, "all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity."

52. EMA has been, and continues to be, irreparably harmed by WODI's failure to honor the Notices of Conversion, failure to maintain a reserve, and failure to remain current in its required SEC filings.

53. Damages from WODI's failure to deliver the shares are inherently uncertain and difficult to calculate. Since the parties entered in the Note in July of 2015, WODI's Stock price has fluctuated widely.

54. Thus, the timing of conversions and sale of stock would be essential to the determination of damages. Because it is difficult to discern precisely when EMA would have sold the converted shares, and how many it would sell had the conversion been honored, calculating its losses is difficult.

55. All notices and prerequisites to bringing this action, if any, including notices of default, have been complied with or were waived.

**FIRST CLAIM FOR RELIEF**
(**SPECIFIC PERFORMANCE**)

56. EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

57. The agreements between plaintiff and defendant are valid agreements.

58. EMA substantially performed all portions of the agreements that were EMA's obligation to perform, except for those obligations for which performance was rendered impossible by virtue of defendant's breach. Among other things, EMA's primary obligation under the various agreements was to fund the purchase of the Note in accordance with the terms of the various agreements, which EMA performed.

59. Pursuant to the Note, SPA, and related agreements, WODI is obligated to deliver shares of WODI Common Stock pursuant to the agreement's payment schedule, as well as to provide with the transfer agent the necessary board resolutions sufficient to enable EMA to sell the shares publicly without restriction.

60. Despite its obligation to do so, WODI has refused and failed to deliver said shares of stock to EMA.

61. WODI has further failed to establish and increase the share reserve as required by the various agreements between the parties. As a result of such failure and refusal by WODI, EMA has suffered damages.

62. EMA has no adequate remedy at law.

63. In the absence of injunctive relief and specific performance, EMA will suffer irreparable harm.

64. EMA requests, therefore, that the Court enter an order requiring WODI to specifically perform the relevant agreements, including the SPA, Note, and letter to transfer agent,

and to deliver immediately to EMA the shares of its Common Stock pursuant to each notice and Notice of Conversion submitted, and to establish and increase the share reserve, as well as to provide EMA with the necessary resolutions, become current in its require SEC filings, and to take whatever steps necessary (as per the terms of the agreement), sufficient to enable EMA to sell the shares publicly without restriction.

## SECOND CLAIM FOR RELIEF
## (BREACH OF CONTRACT)

65. EMA realleges and incorporates by reference each and every allegation contained in all preceding paragraphs of this Complaint as if fully set forth herein.

66. The Note and SPA, are valid and binding agreements.

67. As set forth more fully above, WODI breached the agreements. WODI's numerous breaches of the agreement include, but are not limited to:

(i) failing to honor the Notices of Conversion submitted; and

(ii) failing to make timely filings with the SEC; and

(iii) changing transfer agents, and failing to establish the share reserve; and

(iv) its failure to honor of the terms, conditions, representations and warranties of the SPA and Note;

(v) its default under the terms of the settlement agreements; and

(vi) admitting in writing that it is insolvent and unable to pay its debts as they mature, entry of judgments against it, and being placed into receivership;

(vii) failing to pay the Note upon maturity.

68. WODI's conduct constitutes a breach of, and default under, the terms of the Note, SPA and related agreements.

69. EMA has performed all obligations of the relevant agreements that were its obligation to perform except for those obligations that it could not perform because of defendant's breaches herein.

70. WODI's breach and default are governed by New York law under the terms of the Note.

71. EMA is therefore entitled to an award of damages in an amount to be determined at trial but in any event in excess of principal in the sum $380,000.00, including without limitation the balance of any portion of the Note that ultimately is not converted into shares, along with default interest, liquidated damages, and damages as provided for in the Note and by law.

### THIRD CLAIM FOR RELIEF
### (**PERMANENT INJUNCTION**)

72. EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

73. §4.10 of the Note provides:

> Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

74. Pursuant to its obligations under the relevant agreements, WODI is obligated to deliver shares of its Common Stock, along with the necessary resolutions and acceptance of the legal opinions furnished by EMA, sufficient to enable EMA to sell the shares publicly without restriction.

75. Despite its obligation to do so, WODI has failed and refused to deliver said shares of stock to EMA as required by each of the Notice of Conversion and requests for shares under the settlement agreement.

76. Under the various agreements, WODI was also required to increase and maintain the share reserve, which it failed to do.

77. Though required to under the terms of the Note and SPA, WODI failed to file the required documents with the SEC, although it is now current.

78. As a result of such refusal by WODI, EMA has suffered damages.

79. EMA has no adequate remedy at law.

80. In the absence of injunctive relief, EMA will suffer irreparable harm.

81. Additionally, WODI consented to an injunction when entering into the Note and SPA.

82. EMA requests, therefore, that the Court enter an order enjoining and requiring WODI to deliver the shares of stock as called for in the relevant agreements in response to the Notice of Conversion, including any future notice of conversion, and requests for shares that were or will be sent, to increase and maintain its shares reserve, and to honor future conversion notices.

### FOURTH CLAIM FOR RELIEF
### (COSTS, EXPENSES & ATTORNEYS FEES)

83. EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

84. In accordance with the agreements between the parties, WODI agreed to pay all costs and expenses, including reasonable attorneys' fees and expenses, incurred by EMA in collecting any amount under the Note or breach of the Agreements.

85. Section 4.5 of the Note states, "If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees."

86. Therefore, EMA is entitled to an award against WODI for costs and expenses incurred in the prosecution of this lawsuit, including reasonable legal fees.

### FIFTH CLAIM FOR RELIEF
### (BREACH OF THE SECOND SETTLEMENT AGREEMENT-PLEAD IN THE ALTERNATIVE)

87. EMA realleges and incorporates by reference each and every allegation contained in each preceding paragraph of this Complaint as if fully set forth herein.

88. As set forth above, EMA and WODI entered into the Second Settlement Agreement.

89. The Second Settlement Agreement is a valid and binding agreement.

90. As set forth more fully above, WODI breached the agreement.

91. Among other things, the Second Settlement Agreement provides that WODI agreed to pay EMA the sum of $380,000.00 over a period of approximately 6 weeks.

92. WODI failed to make the payments called for in the Second Settlement Agreement, and thus breached the Second Settlement Agreement.

93. EMA has performed all obligations of the Second Settlement Agreement that were its obligation to perform except for those obligations that it could not perform because of defendant's breaches herein.

94. EMA is therefore entitled to an award of damages in an amount to be determined at trial but in any event in excess of $380,000.00, less any payments made, in addition to all other amounts otherwise due under the Note.

### CLAIM FOR RELIEF

**WHEREFORE**, Plaintiff EMA seeks judgment against Defendants as follows:

i. On the First Claim for Relief, EMA requests that the Court enter an Order requiring Defendant to specifically perform the relevant agreements, including the SPA, Note, and letter to transfer agent, and to deliver immediately to shares of its Common Stock pursuant to each Notice of Conversion, and share requests, file the necessary filings in order to become current in their required SEC filings, and provide the necessary resolutions and acceptance of the legal opinions furnished by EMA, sufficient to enable EMA to sell the shares publicly without restriction, and to increase and maintain its shares reserve.

ii. On all Second Claim for Relief, for damages in an amount to be determined, but in any event in excess of Three Hundred and Eighty Thousand Dollars ($380,000.00); and

iii. On the Third Claim for Relief, the issuance of an injunction enjoining and requiring Defendant to deliver the shares of stock as called for in the relevant agreements in response to the Notice of Conversion that was sent and to increase and maintain its share reserves and to honor future conversion notices; and

iv. On the Fourth Claim for Relief for an award of EMA's costs and expenses in prosecuting this action, including reasonable legal fees;

v. On the Fifth claim for Relief, awarding damages of $380,000.00 in addition to all other amounts otherwise due under the Note, less any payments made;

vi. On all Claims for Relief, for interest, attorneys' fees and the costs and disbursements of this action; and

vii. For such other further relief as the Court may deem just, proper, and in the interest of justice.

Dated: May 5, 2020
    New York, New York

                                LAW OFFICE OF JEFFREY FLEISCHMANN PC
                                       By: /s/Jeffrey Fleischmann
                                    Jeffrey Fleischmann, Esq.

                        *Attorneys for Plaintiff EMA Financial, LLC*

                        150 Broadway, Suite 900
                        New York, N.Y. 10038
                        Tel. (646) 657-9623
                        Fax (646) 351-0694
                        jf@lawjf.com